J-S01024-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CALVIN STEWART ALSTON | : | |
| | : | |
| Appellant | : | No. 195 WDA 2022 |

Appeal from the Judgment of Sentence Entered October 20, 2021,
in the Court of Common Pleas of Allegheny County,
Criminal Division at No(s):  CP-02-CR-0012015-2018.

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                  **FILED: April  10, 2023**

Calvin Stewart Alston appeals from the judgment of sentence imposed after a jury found him guilty of first-degree murder and carrying a firearm without a license ("VUFA").[1]  Upon review, we affirm.

The trial court set forth the relevant evidence as follows:

On July 28, 2018, at approximately 11:00 p.m., [Alston] shot and killed his girlfriend, Vera Butler, on the sidewalk in front of her Northside home on Luray Street.  She was shot four (4) times and tragically succumbed to her injuries at 11:36 p.m., when she was pronounced dead on the scene by the paramedic crew.

Harold Neal, Ms. Butler's neighbor, identified [Alston] as the shooter at trial.  Mr. Neal saw [Alston] with the victim just minutes before she was killed, and he saw [Alston] with a firearm immediately after the shots were fired.  Mr. Neal had been Ms. Butler's neighbor for approximately 9-10 years, and he knew her

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a) and 6106(a)(1).

well. Mr. Neal was able to identify [Alston] on the night of the murder because he was familiar with [him] based on past interactions. Mr. Neal had seen [Alston] "multiple times" in person, and he would say hello to [him] "anytime" that he saw him. Mr. Neal testified that, on the night of the murder, he went outside to meet a friend at approximately 10:30 p.m., just before the shooting. His friend arrived in a vehicle and parked directly in front of [Alston]'s black pickup truck on Luray Street. As Mr. Neal walked towards his friend's car, he saw Ms. Butler sitting with "her boyfriend, Calvin" in his truck, which was an older model Chevy. Mr. Neal knew it was [Alston's] truck because he had never seen anyone but [Alston] drive that truck in the past. He saw [Alston] sitting in the driver's seat and Ms. Butler in the passenger seat. The truck was parked so that the passenger side of the truck was positioned across the street from Mr. Neal's house.

As Mr. Neal passed by [Alston's] truck, Mr. Neal said, "hey, how y'all doing?" Both [Alston] and Ms. Butler put their hands up to acknowledge him and gesture hello. At that time, the street was quiet, and there was no foot or car traffic in the area. Mr. Neal sat in his friend's car, and the two had a conversation that lasted approximately five (5) minutes. When Mr. Neal got out of the car, [Alston] and Ms. Butler were still in [Alston]'s truck. When Mr. Neal walked past them for the second time, he waved and said "I'll see y'all later," but this time neither of them acknowledged him.

As Mr. Neal was walking up the stairs to his residence, he heard what sounded like two growls coming from the truck. Mr. Neal "knew who was making the noise" because [Alston] and Ms. Butler were still in the truck, his friend had just left, and "[t]here was nobody else on the street." He continued walking up the stairs and went inside to microwave food. As he was waiting for his food to finish cooking, he heard three (3) gunshots. He immediately opened his front door and looked down the street. Mr. Neal then heard [Alston] say, "see what you made me do. See what you made me do." Mr. Neal watched [Alston] walk" from the passenger side around to the driver side from behind his truck, get in the truck and casually pull off." Mr. Neal saw [Alston] holding a firearm as [Alston] was walking around the truck to get back into the vehicle. Though Mr. Neal could not see [Alston] because there were only a few streetlights in that area, he testified that he knew it was [Alston] who made those statements because [he] was the only person outside, and Mr. Neal recognized him by his voice, stature, body language, and gait. Mr. Neal went inside

of his house, finished eating his dinner, then went back outside when police officers arrived. Pittsburgh Police Officer Song, one of the responding officers, testified that he spoke with multiple neighbors who talked about "a black pickup truck that made a distinct noise." While they were still on the scene, Officer Song heard " a very large engine revving" in the vicinity. He testified that the revving sounded like it was coming from Marshall Avenue, which is parallel to Luray Street. He attempted to catch up to the vehicle, but he was unable to locate it. Officers obtained surveillance camera footage of the scene from Corey Covington, one of Ms. Butler's neighbors. Mr. Covington was interviewed by the officers, and he told them that a black truck that had a hole in its exhaust was on the street that night. Officers put out a BOLO for [Alston]'s vehicle, which was "an early 2000 Chevy Silverado with an extended cab, black in color, and having a Texas license plate." [Alston]'s truck was located 20 minutes away from the scene of the murder. Surveillance cameras in the area showed that, at approximately noon on July 29, 2018, the day after the murder, a black male legally parked the truck, exited the vehicle, and never returned to it. The truck was subsequently towed, and a search of the vehicle was conducted on July 30, 2018, two days after Ms. Butler's murder. The truck was registered to [Alston], his DNA was found inside of the vehicle, and envelopes containing [Alston's] name and address were located inside of the truck bed.

On August 3, 2018, approximately six (6) days after Ms. Butler's murder, [Alston] appeared at the Renewal Center on Second Avenue around 10:30 p.m., confessed to the murder and tried to turn himself in. According to Renewal employee Ryan Niznik, [Alston] walked up to the glass outside of the building and told Mr. Niznik, "I have a warrant for my arrest. They said I killed my girlfriend." Mr. Niznik observed that [Alston] appeared "anxious, nervous" and was sweating. Mr. Niznik told his coworker, Aleila Lewis, to call 911. Aleila Lewis had already seen [Alston] prior to the time that Mr. Niznik told her to call 911 because she noticed [Alston] outside while she was in her car waiting for her shift to start. Her attention was drawn to him because he was walking past her on his phone with his voice raised, and he appeared "a little agitated." Her windows were halfway down, and she heard [Alston] say, "I just have to do it." [Alston's] behavior made Ms. Lewis feel uncomfortable, so she waited until he walked past her vehicle and then she ran inside of her building.

As she was telling Mr. Niznik about [Alston], [Alston] knocked on the glass, and she said, "that's him" to Mr. Niznik. Mr. Niznik hit

the intercom button in her presence and asked [Alston] what he needed. Ms. Lewis testified that she heard [Alston] say, "I need to turn myself in. I just killed my girlfriend." Mr. Niznik turned to her and said, "did you guys hear that?" and she replied, "I wish I did not." She told Mr. Niznik to ask him again, and he did. [Alston] once again stated, "I need to turn myself in. I just killed my girlfriend" and that's when Ms. Lewis dialed 911. Ms. Lewis testified that she "clearly heard the whole conversation."

Ms. Lewis told the 911 dispatcher that there "was a gentleman outside of our building who was trying to turn himself in. He stated that he had just killed his girlfriend." The dispatcher asked Ms. Lewis to describe [Alston] and whether he had any weapons. While she was on the line with the dispatcher, she had Mr. Niznik ask [Alston] why he was at Renewal, and [Alston] said, "there's a warrant out for me. Google me. My name is Calvin Alston. They have been looking for me for five days." The dispatcher then told her that police were on their way. Mr. Niznik tried to direct [Alston] to Municipal Court. Ms. Lewis testified that she did not ask [Alston] for any more details because "[o]nce he said I killed my girlfriend, my concern was picking him up and getting him away from my building."

Trial Court Opinion, 4/22/22, at 4-10.

Following trial, a jury found Alston guilty of first-degree murder and VUFA. On October 20, 2021, the trial court sentenced Alston to life imprisonment for first-degree murder and a consecutive term of 3 to 6 years' incarceration for the VUFA conviction. Alston filed a post-sentence motion, which the court denied.

Alston filed this timely appeal. Alston and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, Alston raises the following six issues which we have reordered for ease of disposition.

I. The conviction for first degree murder was not supported by sufficient evidence because the Commonwealth failed to offer any

- 4 -

physical evidence linking Alston to the shooting, and they did not offer any witness who identified Alston as the shooter.

II. The conviction for first degree murder was against the weight of the evidence, because it relied upon the testimony of witness Aleila Lewis whose testimony was not credible.

III. The trial court erred by instructing the jury on flight and consciousness of guilt where there was no evidence of flight presented to the jury.

IV. The trial court erred by instructing the jury on a "statement" attributed to Alston which related to the testimony provided by witness Lewis. The instruction given confused the jury, as it related to written or adopted statements provided to authorities and did not apply to the facts presented.

V. The trial court erred in denying the motion for judgment of acquittal on the charge of carrying a firearm without a license, where the Commonwealth did not present any evidence to establish that Alston concealed a firearm on his person or in his vehicle.

VI. The conviction for carrying a firearm without a license was not supported by sufficient evidence where there was no testimony presented that Alston was seen concealing a firearm on his person or with a firearm in his vehicle.

Alston's Brief at 6.

Alston's first four issues pertain to his conviction for first degree murder. In his first issue, Alston claims that the evidence was insufficient to sustain his conviction for first-degree murder. Specifically, Alston argues that the evidence failed to establish that he was the shooter with any physical evidence or eyewitness testimony identifying him as the shooter. Alston's Brief at 26. Alston maintains that the Commonwealth's case hinged on the incredible testimony of Aleila Lewis who called 911 from the Renewal Center. *Id.* at 28.

Our standard of review when considering challenges to the sufficiency of the evidence is as follows:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Williams*, 176 A.3d 298, 305–06 (Pa. Super. 2017) (citations and quotation marks omitted).

Alston's claim relates solely to the sufficiency of the Commonwealth's identification evidence. Accordingly, we limit our discussion to the evidence for that element. *See Commonwealth v. Cain*, 906 A.2d 1242, 1244 (Pa. Super. 2006) (declining to address the sufficiency of the evidence supporting every element of an offense where the appellant raises a claim relating to one specific element); *see also Commonwealth v. Smyser*, 195 A.3d 912, 915 (Pa. Super. 2018) ("In addition to proving the statutory elements of the crimes charged beyond a reasonable doubt, the Commonwealth must also establish the identity of the defendant as the perpetrator of the crimes").

Here, the evidence, as summarized by the trial court, showed:

- 6 -

(i) [Alston] and the victim had a romantic relationship; (ii) [Alston] was the only person seen with the victim immediately prior to and after the shooting; (iii) [Alston] was heard making growling sounds towards the victim immediately prior to the shooting; (iv) [Alston] was heard saying "see what you made me do" immediately after the shooting; (v) [Alston] was seen holding a firearm after the shooting when he was getting back into his truck; (vi) [Alston] left the scene after the shooting; (vii) [Alston] abandoned his truck approximately 12 hours after the murder; and (viii) [Alston] confessed to the murder at Renewal a week later and tried to turn himself in.

Trial Court Opinion, 4/22/22, at 19 (citations omitted). This evidence was sufficient for the jury to find that Alston was the person who shot and killed Vera Butler. There were many facts which pointed to Alston as the shooter. Contrary to Alston's claim, the identification of him as the shooter was not based solely on the testimony of Aleila Lewis.

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that there was sufficient evidence to allow the jury to find that Alston shot and killed Vera Butler and sustain his conviction for first-degree murder.

In his second issue, Alston claims that the trial court erred in denying his claim that the verdict for first-degree murder was against the weight of the evidence. Specifically, he argues that Aleila Lewis' testimony was not credible. Alston's Brief at 22-23.

When reviewing a challenge to the weight of the evidence, our standard of review is as follows:

The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support.

> *Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.*
>
> * * *
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> * * *
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. *Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.*

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013) (citations omitted) (emphasis added). Absent an abuse of discretion, the trial court's decision will not be disturbed. *See Commonwealth v. Griffin*, 515 A.2d 865, 869 (Pa. 1986). An abuse of discretion "is not merely an error in judgment. Rather, it involves bias, partiality, prejudice, ill-will, manifest unreasonableness or a misapplication of the law." *Commonwealth v. West*, 937 A.2d 516, 521 (Pa. Super. 2007). By contrast, a proper exercise of discretion "conforms to the law and is based on the facts of record." *Id.*

Here, the trial court concluded that the jury's verdict was not against the weight of the evidence; the verdict did not shock its sense of justice. Trial Court Opinion, 4/22/22, at 16, 18. In reaching this decision, the court

thoroughly reviewed *all* the evidence presented to support Alston's conviction for murder. In particular, it observed that "the murder conviction did not rest solely upon the testimony of Aleila Lewis. . . . the Commonwealth presented many pieces of circumstantial evidence that, when taken together, conclusively established [Alston's] guilt." *Id.* Furthermore, as the trial court noted, Alston's "challenge to the weight of the evidence is, at its core, an invitation for the appellate court to reweigh the evidence and second-guess the credibility determinations made by the jury in this case." *Id.* at 17. We agree and are prohibited from doing so. Therefore, we conclude that the trial court did not abuse its discretion when it denied Alston's motion for a new trial based upon his weight claim.

In his third and fourth issues, Alston claims that the trial court erred in giving the jury certain instructions. He first argues that the court's instruction on flight and consciousness of guilt was not supported by the evidence. Alston maintains that the court ignored the fact that he surrendered himself to authorities, which does not support that he was fleeing. Alston's Brief at 29.

Alston also claims that the trial court erred when it instructed the jury regarding a "statement" allegedly made by Alston confessing that he killed his girlfriend. Alston argues that this confused the jury because this instruction pertains to a written or adopted statement typically given to authorities. Alston maintains that he did not make the statement, and further, it was not a statement given to the police or one that he signed off on or that he adopted.

*Id.* at 33. Thus, according to Alston, the court should not have given these statements, he was prejudiced thereby, and as such is entitled to a new trial.

Our standard of review regarding a trial court's jury instructions is whether the trial court abused its discretion or inaccurately stated the law. *See Commonwealth v. Antidormi,* 84 A.3d 736, 754 (Pa. Super. 2014). "A trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law clearly, adequately, and accurately presented to the jury for its consideration." *Id.*

> When reviewing jury instructions for reversible error, an appellate court must read and consider the charges as a whole. We will uphold an instruction if it adequately and accurately reflects the law and is sufficient to guide the jury through its deliberations. Error will not be predicated on isolated excerpts. Instead, it is the general effect of the charge that controls. An erroneous charge warrants the grant of a new trial unless the reviewing court is convinced beyond a reasonable doubt that the error is harmless.

*Commonwealth v. Ketterer,* 725 A.2d 801, 804-805 (Pa. Super. 1999) (quoting *Commonwealth v. Nichols*, 692 A.2d 181, 186 (Pa. Super. 1997).

First, regarding the flight instruction, it is proper to give this to a jury when "a person commits a crime, knows that he is wanted therefor, and flees or conceals himself." *Commonwealth v. Clark*, 961 A.2d 80, 92 (Pa. 2008) (citation omitted). "[S]uch conduct is evidence of consciousness of guilt, and may form the basis of a conviction in connection with other proof from which guilt may be inferred." *Id.*

Here, the trial court determined that the evidence supported the issuance of the flight instruction. "Defendant's act of 'casually pulling off'

- 10 -

constituted flight as it marked his 'departure from the scene of the crime' after he shot his girlfriend four (4) times and left her for dead on the sidewalk." Trial Court Opinion, 4/22/22, at 20. Additionally, the evidence established that, the day after the shooting, Alston abandoned his truck at a location 20 minutes away from the crime scene, and his license plate was missing. Such testimony further justified an inference that Alston was attempting to flee.

Furthermore, despite the instruction, the jury was still able to consider that he turned himself in, albeit six days after the shooting. The trial court made it clear that it was up to the jurors to determine what weight, if any, should be given to the evidence, that "[s]uch flight does not necessarily show consciousness of guilt in every case[,]" and that the jury could not find Alston guilty "solely on the basis of evidence of flight or leaving the scene." N.T., 7/15/21, at 432-33.

Based upon our review, we conclude that the trial court did not err or abuse its discretion in giving the jury instruction regarding flight and consciousness of guilt.

As for the court's instruction on Alston's alleged statement, "I just killed my girlfriend," it too was supported by the evidence of record; Aleila Lewis testified at trial that she heard Alston say this. It was then for the jury to determine whether he did or did not say it. The court's instruction made this clear to the jury. *Id.* at 433-34.

The court explained that it adapted its instruction from jury instruction 3.01 and 3.03 and did so "to ensure that the jury was properly instructed in

the law and that voluntariness was addressed in accordance with the proper legal standards[.]" Trial Court Opinion, 4/22/22, at 8. There was absolutely no reference that it constituted an admission or a confession or was given to the police or other authority. It merely gave guidance to the jury as to how to handle the statement without indicating one way or the other whether Alston in fact made the statement. We therefore conclude that the trial court did not error or abuse its discretion in giving this instruction.

Alston's last two issues relate to his VUFA conviction. In his fifth and sixth issues, Alston challenges the sufficiency of the evidence to sustain his conviction for carrying a firearm without a license.[2] Specifically, Alston argues that there was no evidence that he concealed a firearm; instead, he carried it openly as Mr. Neal testified that he saw him carrying a gun. Alston's Brief at 18. Again, we review these issues with our well-settled standard of review in mind. **See Commonwealth v. Williams**, 176 A.3d at 305-06.

Section 6106 of Pennsylvania's Uniform Firearms Act provides, in relevant part, as follows:

> **§ 6106. Firearms not to be carried without a license.**
>
> (a) Offense defined.--
>
> (1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or

---

[2] A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge. **See Commonwealth v. Emanuel**, 86 A.3d 892, 894 (Pa. Super. 2014).

fixed place of business, without a valid and lawfully issued license under this Chapter commits a felony of the third degree.

18 Pa.C.S.A. § 6106(a)(1).  Thus, a person is guilty of a felony in the third degree if he **_carries a firearm in a vehicle_**, or concealed on or about his person, without a valid and lawfully issued license.  **_Id._** (emphasis added).

At trial the parties stipulated that Alston did not have a valid concealed carry permit at the time of the murder.  The question remained however whether Alston concealed the gun on his person or in his vehicle.  Following the Commonwealth evidence, Alston moved for judgment of acquittal based on insufficient evidence. The trial court denied his motion.

Here, as the trial court explained, Mr. Neal testified that he saw Alston carrying a firearm in his hand as he walked to the driver's side of his truck shortly after the shooting.  From this, the jury could reasonably infer that Alston had originally possessed the gun in his truck before he got out to shoot the victim. Additionally, the jury could infer that Alston took the gun back inside of the truck when he drove away because no gun was found at the scene.  The court further noted, "[r]ejecting the notion that [Alston] had the firearm inside of his vehicle prior to and after the shooting would all but require a conclusion that he somehow procured this weapon from a nearby bush or sidewalk."  Trial Court Opinion, 4/22/22, at 13.  Thus, there was evidence from which the jury could infer that Alston had it in the vehicle before and after the shooting.  The statute is satisfied if there is evidence that Alston carried a gun inside a vehicle.  Consequently, viewing the evidence in the light

most favorable to the Commonwealth as the verdict winner, we conclude that there was sufficient evidence to sustain Alston's VUFA conviction. For the same reason, we conclude that the trial court did not error in denying Alston's motion for judgment of acquittal.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/10/2023